FILED

1   Brian Barry (135631: bribarry1@yahoo.com)
    LAW OFFICES OF BRIAN BARRY
2   1801 Avenue of the Stars, Suite 307
    Los Angeles, California 90067
3   Telephone:   (310) 788-0831
    Facsimile:   (310) 788-0841
4

5   *Attorneys for Plaintiff*

2008 JUN -4 PM 3: 18

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY _____

6

7                    **UNITED STATES DISTRICT COURT**

8                    **CENTRAL DISTRICT OF CALIFORNIA**

9   Mark Moynahan, on behalf of himself and all       )
    others similarly situated,                        )    Case No.
10                                                      )
                    Plaintiff,                          )   **SACV08-0620**
11                                                      )
           v.                                           )   **CLASS ACTION**
12                                                      )   **COMPLAINT**
    FIDELITY NATIONAL FINANCIAL, INC.,                  )
13  FIDELITY NATIONAL TITLE                             )   **JURY TRIAL DEMANDED**
    INSURANCE COMPANY, TICOR TITLE                      )
14  INSURANCE COMPANY, TICOR TITLE                      )
    INSURANCE COMPANY OF FLORIDA,                       )
15  CHICAGO TITLE INSURANCE                             )
    COMPANY, NATIONAL TITLE                             )
16  INSURANCE OF NEW YORK, INC.,                        )
    SECURITY UNION TITLE INSURANCE                      )
17  COMPANY, THE FIRST AMERICAN                         )
    CORPORATION, FIRST AMERICAN                         )
18  TITLE INSURANCE COMPANY, UNITED                     )
    GENERAL TITLE INSURANCE                             )
19  COMPANY, LANDAMERICA FINANCIAL                      )
    GROUP, INC., COMMONWEALTH LAND                      )
20  TITLE INSURANCE COMPANY,                            )
    LAWYERS TITLE INSURANCE                             )
21  CORPORATION, TRANSNATION TITLE                      )
    INSURANCE COMPANY, STEWART                          )
22  TITLE GUARANTY COMPANY and                          )
    STEWART TITLE INSURANCE                             )
23  COMPANY                                             )
                                                         )
24                    Defendants.                        )
                                                         )
25  _____

AHS
(ANx)

26

27

28

COPY

# TABLE OF CONTENTS

|  |  | PAGE |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | JURISDICTION AND VENUE | 5 |
| III. | PARTIES | 5 |
|  | A. Plaintiff | 5 |
|  | B. Defendants | 6 |
| IV. | OTHER ENTITIES | 12 |
| V. | CLASS ACTION ALLEGATIONS | 13 |
| VI. | TRADE AND COMMERCE | 16 |
| VII. | FACTUAL ALLEGATIONS | 17 |
|  | A. The Nature of Title Insurance | 17 |
|  | B. Price-Fixing in the Large Markets | 19 |
|  | C. TIRSA's Formation | 21 |
|  | D. Lack of Regulatory Supervision and Authority in New York and Other States Including California | 23 |
|  | E. Competition Based on Kickbacks and Inducements But Not Rates | 29 |
|  | F. Other Indicators of a Lack of Competition and Conditions Conducive to Collusive Rate Setting | 30 |
| VIII. | CLAIMS FOR RELIEF | 34 |
|  | COUNT I  Violation of the Sherman Act | 34 |
|  | COUNT II  Violation of Cal. Bus. and Prof. Code §§ 16720, *et seq.* | 36 |
|  | COUNT III  (California's Business & Professions Code §§ 17200, *et seq.*) | 37 |
|  | COUNT IV  Unjust Enrichment | 38 |
| PRAYER FOR RELIEF | | 39 |
| JURY TRIAL DEMANDED | | 40 |

CLASS ACTION COMPLAINT

Plaintiff, Mark Moynahan, by his attorneys, on behalf of himself and all others similarly situated, brings this action for treble damages and injunctive relief under the antitrust laws of the United States and based on statutes of the State of California against the above named defendants, demand a trial by jury, and complaining and alleging as follows:

## I.    INTRODUCTION

1.    From the consumer's point of view, title insurance differs greatly from other, more familiar kinds of insurance.  For one thing, while automobile and homeowner insurance policies protect consumers from an event that may occur in the future, title insurance offers protection from events that might have occurred in the past.

2.    Most simply, title insurance is protection purchased against a loss arising from problems that occurred in the past and may affect the title to the real estate that a consumer is buying.  Title insurers do not compete on the basis of the policies or coverage that they provide.  In fact, almost all title policies are based on a single set of form policies published and maintained by the national trade association, the American Land Title Association.  Furthermore, the end goal of an exhaustive title search by a title insurer is not to provide coverage for title defects that the search uncovers, but rather to exclude coverage for any such defects and therefore, further reduce the real value of the title policy which is written to cover

only unknown defects in title at the time of issuance.  As a result, title insurance is a commodity product.

3.    Even for the savviest of insurance consumers, the purchase of a title insurance policy is just one more expensive step in the dizzying, convoluted and often confusing flurry of paperwork and signings that culminate in the closing of a home purchase.  Consumers who normally shop around for their insurance and carefully compare prices, typically emerge from the closing on their new home holding an insurance policy that they know virtually nothing about and that in all likelihood, they will never need.

4.    The title insurance market in California consists of a dozen carriers, ranging in size from regional companies to national affiliates.  However, the market is dominated by four groups of affiliated companies which, combined, sell over 85 percent of the title insurance policies sold in California and which own and control the title plants in many California counties that every title insurer must rely on in order issue title policies.

5.    Title companies, in marked contrast to property, casualty, life and other traditional insurance carriers, choose not to market their products directly to the consumers who pay for them. Instead, the title insurance industry operates on what is termed a "reverse competition" model. Reverse competition means that title companies solicit business referrals from the other major players in the home purchase scenario – real estate agents and agencies, banks, lenders, builders,

developers and others: middlemen or go-betweens. The title companies pay middlemen for these referrals in the form of direct payments, advertising expenses, junkets, parties and other kick-backs and inducements. In addition, middlemen such as Windermere, John L. Scott and Caldwell Banker-Bain, who themselves control a significant portion of the real estate brokerage market, take significant ownership stakes in local title agents and affiliates of the major title insurers and thereby get a direct return in profit from the referral of title business to the title agent whom they partly or wholly own.

6.     Reverse competition, as the term suggests, isn't a model that benefits consumers through market-driven forces. In fact, consumers are bypassed completely as title companies spend nearly all of their marketing budgets "wining and dining" real estate agents, banks, lenders, builders, developers and others in an effort to convince these middlemen to steer their home-buying clients to their companies for their title insurance needs.

7.     In some of the major markets in the United States, these same title insurers collectively meet, and jointly set rates and file these rates with the applicable state insurance authority. The rates are not subject to any meaningful review or regulation. The companies agree to fix the price of title insurance far in excess of the risk and loss experience associated with such insurance. As a result of the joint agreement as to rates, competition is relegated to the middleman. As a result of their joint rate setting and agreement, no company competes on price to the consumer.

CLASS ACTION COMPLAINT

8.    Having agreed to fix prices in states where joint rate setting occurs, the companies agreed to not compete based on price to the consumer in other states, including California, where regulation of filed rates is lax or non-existent.  Thus, they agreed to set rates at supra competitive prices and to compete based on offering inducements to middlemen.  In California, in three successive reports, the Office of the Insurance Commissioner ("OIC") has found an "astonishing number" of such inducements that are in violation of state law.  However, the OIC does not actively oversee or regulate rates, and, in fact, does not by its own admission have the power to do so.  The absence of regulation has allowed collusive behavior and excessive rates.

9.    In addition to paying inducements and kick-backs, the title companies and their agents divide the market of real-estate middlemen through the use of Affiliated Business Arrangements ("ABAs"), wherein the dominant real estate brokers purchase significant ownership stakes in favored title insurance affiliates. The real estate brokers then reward their associates for using the preferred title insurance providers and lock-out independent title insurers.

10.    In this action, plaintiff, on behalf of a Class of those purchasing title insurance in California, seek damages arising from defendants' violations of the Sherman Act as well as California statutory law.

## II.    JURISDICTION AND VENUE

11.    This Complaint is filed and these proceedings are instituted under Sections 4 and 16 of the Act of Congress of October 15, 1914, C. 323, Stats. 731, 737 (15 U.S.C. §§ 15, 26) to obtain injunctive relief and to recover treble damages and the costs of suit, including a reasonable attorneys' fee, against defendants for the injuries sustained by plaintiff and the members of the Class which she represents by reason of defendants' and their co-conspirators' violations, as hereinafter alleged, of Section I of the Sherman Act (15 U.S.C. § 1).

12.    Defendants transact business, maintain offices or are found within the Central District of California.  The interstate commerce described hereinafter is carried on, in part, within the Central District of California and the conspiratorial acts herein alleged were carried on, in part, in the Central District of California.

## III.    PARTIES

### A.    Plaintiff

13.    Mark Moynahan, during the Class Period, purchased title insurance directly from Chicago Title, one of the defendants herein and has been injured by reason of the antitrust violations alleged.

**B.     Defendants**

14.     Defendant Fidelity National Financial, Inc. ("Fidelity National") is a Delaware corporation headquartered at 601 Riverside Avenue, Jacksonville, Florida 32204. Fidelity National does business in California through one or more of its subsidiaries, including but not limited to, defendants Fidelity National Title Insurance Company, Ticor Title Insurance Company, Ticor Title Insurance Company of Florida, National Title Insurance of New York, Inc., Security Union Title Insurance Company, and Chicago Title Insurance Company. Fidelity National is registered to do business in California.

15.     Defendant Fidelity National Title Insurance Company ("FNTIC") is a California Corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204. FNTIC does business in California, is a licensed title insurance company in California and is registered to do business in California.

16.     Defendant Ticor Title Insurance Company ("Ticor") is a California Corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204. Ticor does business in California, is a licensed title insurance company in California and is registered to do business in California.

17.     Defendant Ticor Title Insurance Company of Florida ("TTICF") is a Florida corporation with its principle place of business at 601 Riverside Ave.,

Jacksonville, Florida 32204. TTICF does business in California, is a licensed title insurance company in California and is registered to do business in California.

18.     Defendant Chicago Title Insurance Company ("Chicago Title") is a Missouri Corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204. Chicago Title does business in California, is a licensed title insurance company in California and is registered to do business in California.

19.     Defendant National Title Insurance of New York, Inc. ("NTINY") is a New York corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204. NTINY does business in California, is a licensed title insurance company in California and is registered to do business in California.

20.     Defendant Security Union Title Insurance Company ("SUTIC") is a California corporation with its principle place of business at 601 Riverside Ave., Jacksonville, Florida 32204. SUTIC does business in California, is a licensed title insurance company in California and is registered to do business in California.

21.     The Fidelity family of title insurance companies (collectively, "Fidelity") – which includes defendants Fidelity National, FNTIC, Ticor, TTICF, Chicago Title, NTINY and SUTIC, and their affiliates – is engaged in selling title insurance to purchasers of commercial and residential real estate throughout the United States, including California. Nationally, Fidelity accounts for approximately 27 percent of title premiums, which in 2006 amounted to roughly $4.6 billion. Fidelity, Chicago Title and Ticor were founding members of TIRSA (defined below)

CLASS ACTION COMPLAINT

and since TIRSA's inception have charged title insurance rates in New York that TIRSA collectively sets.

22.    The Fidelity family of title insurance companies and their affiliates are wholly-owned and controlled by defendant Fidelity National Financial, Inc. Through its subsidiaries, Fidelity National is a provider of title insurance, specialty insurance, and claims management services. Fidelity National had 2006 revenues of roughly $9.4 billion. The Fidelity family of title insurance companies engaged in the conduct challenged herein with the approval and assent of defendant Fidelity National.

23.    Defendant The First American Corporation ("First American") is a California corporation with its headquarters at 1st American Way, Santa Ana, California 92707. First American does business in California through one or more of its subsidiaries, including but not limited to, defendants First American Title Insurance Company and United General Title Insurance Company.

24.    Defendant First American Title Insurance Company ("FATIC") is a California corporation with its headquarters at 1st American Way, Santa Ana, California 92707. FATIC does business in California, is a licensed title insurance company in California and is registered to do business in California.

25.    Defendant United General Title Insurance Company ("UGTIC") is a Colorado corporation located at 8310 S. Valley Highway, Suite 130, Englewood, CO

80112. UGTIC does business in California, is a licensed title insurance company in California and is registered to do business in California.

26.    The First American family of title insurance companies (collectively, "First American") – which includes defendants First American, FATIC and UGTIC, and their affiliates – is engaged in selling title insurance to purchasers of commercial and residential real estate throughout the United States, including California. Nationally, First American accounts for approximately 29 percent of title premiums, which in 2006 amounted to roughly $4.8 billion. First American Title was a founding member of TIRSA and since TIRSA's inception has charged title insurance rates in New York that TIRSA collectively sets.

27.    The First American family of title insurance companies and their affiliates are wholly-owned and controlled by defendant The First American Corporation. Through its subsidiaries, First American is a provider of title insurance, business information, and related products and services. First American had 2006 revenues of roughly $8.5 billion. The First American family of title insurance companies and their affiliates engaged in the conduct challenged herein with the approval and assent of defendant First American.

28.    Defendant LandAmerica Financial Group, Inc. ("LandAmerica") is a Virginia corporation headquartered at 5600 Cox Road, Glen Allen, Virginia 23060. LandAmerica does business in California through one or more of its subsidiaries, including but not limited to, defendants Commonwealth Land Title Insurance

Company, Lawyers Title Insurance Corporation and Transnation Title Insurance Company.

29.    Defendant Commonwealth Land Title Insurance Company ("CLTIC") is a Pennsylvania corporation with is principle place of business at 5600 Cox Road, Glen Allen, Virginia 23060.  CLTIC does business in California, is a licensed title insurance company in California and is registered to do business in California.

30.    Defendant Lawyers Title Insurance Corporation ("LTIC") is a Nebraska corporation with is principle place of business at 5600 Cox Road, Glen Allen, Virginia 23060.  LTIC does business in California, is a licensed title insurance company in California and is registered to do business in California.

31.    Defendant Transnation Title Insurance Company ("TNTIC") is a Nebraska corporation with is principle place of business at 5600 Cox Road, Glen Allen, Virginia 23060.  TNTIC does business in California, is a licensed title insurance company in California and is registered to do business in California.

32.    The LandAmerica family of title insurance companies (collectively, "LandAmerica") – which includes defendants LandAmerica, CLTIC, LTIC and TNTIC, and their affiliates – is engaged in selling title insurance to purchasers of commercial and residential real estate throughout the United States, including California.  Nationally, LandAmerica accounts for approximately 19 percent of title premiums, which in 2006 amounted to roughly $3.15 billion.  Commonwealth and

Lawyers Title were founding members of TIRSA and since TIRSA's inception have charged title insurance rates in New York that TIRSA collectively sets.

33.    The LandAmerica family of title insurance companies and their affiliates are wholly-owed and controlled by defendant Land America Financial Group, Inc.  Through its subsidiaries, LandAmerica is a provider of title insurance and other products and services that facilitate the purchase, sale, transfer, and financing of residential and commercial real estate.  LandAmerica had 2006 revenues of roughly $4 billion.  The LandAmerica family of title insurance companies and their affiliates engaged in the conduct challenged herein with the approval of defendant LandAmerica.

34.    Defendant Stewart Title Guaranty Company ("STGC") is a Texas corporation headquartered at 1980 Post Oak Blvd., Suite 800, Houston, Texas 77056.  STGC does business in California, is a licensed title insurance company in California and is registered to do business in California.

35.    Defendant Stewart Title Insurance Company ("STIC") is a New York corporation with its principle place of business at 300 E. 42nd St., Floor 10, New York, NY 10017.  STIC does business in California, is a licensed title insurance company in California and is registered to do business in California.

36.    The Stewart family of title insurance companies (collectively, "Stewart") – which includes defendants STGC and STIC, and its affiliates – is engaged in selling title insurance to purchasers of commercial and residential real

estate throughout the United States and California. Nationally, Stewart accounts for approximately 12 percent of title premiums, which in 2006 amounted to roughly $2 billion. Stewart was a founding member of TIRSA and since TIRSA's inception has charged title insurance rates in New York that TIRSA collectively sets.

37.    Together, defendants account for more than 85 percent of the title premiums consumers pay in California. Nationally, they account for more than 85 percent of title premiums, which in 2006 amounted to roughly $14.5 billion. Throughout the relevant damages period, defendants charged California consumers in California virtually identical title insurance rates.

## IV.    OTHER ENTITIES

38.    TIRSA is a voluntary association of title insurers licensed as a rate service organization pursuant to Article 23 of the State of New York Insurance Law. TIRSA maintains its offices in New York City, which until recently were located at the same New York address of Fidelity Title.

39.    TIRSA annually compiles from its members statistical data relating to their title insurance premiums, losses and expenses and submits this information in aggregate form to the New York Insurance Department. TIRSA also prepares and submits the New York Title Insurance Rate Manual which sets forth title rates to be charged and rules to be followed by TIRSA's members. The Insurance Department has never objected to any of the rates TIRSA has collectively set. Similarly, the

CLASS ACTION COMPLAINT

- 12 -

California OIC has not actually held a public hearing or conducted any other review or regulation of the title insurance rates in California for thirty years.

40.    TIRSA's membership is comprised of defendant insurers and all other title insurers that are licensed to issue policies in New York. Currently, Fidelity, First American, LandAmerica, and Stewart collectively represent 14 of TIRSA's 22 members. As such, they comprise a majority voting block which, according to TIRSA's by-laws, allows them to control the operations of TIRSA and, in particular, TIRSA's collective rate setting activity.

41.    Various other persons, firms and corporations not made defendants herein have participated as co-conspirators with the defendants in the violations alleged herein and have performed acts and made statements in furtherance thereof.

## V.    CLASS ACTION ALLEGATIONS

42.    Plaintiff brings this action under Rule 23, and particularly subsection (b)(3), of the Federal Rules of Civil Procedure, on behalf of herself and a Class consisting of all persons excluding governmental entities, defendants, subsidiaries and affiliates of defendants, who purchased directly, from one or more of the defendants and/or their co-conspirators title insurance for residential and commercial property in California beginning in March 2004 and who have sustained damages as a result of the conspiracy herein alleged. The number of potential Class members is so numerous that joinder is impracticable.

43.    Plaintiff, as representative of the Class, will fairly and adequately protect the interest of the Class members.  The interests of plaintiff are coincident with, and not antagonistic to, those of the Class members.

44.    Except as to the amount of damages each member of the Class has by itself sustained, all other questions of fact and law are common to the Class, including but not limited to, the combination and conspiracy hereinafter alleged, the violation of Section 1 of the Sherman Act (15 U.S.C. § 1) and the effects of such violation.

45.    Plaintiff, along with all other members of the Rule (b)(3) Class, were injured as a result of paying supracompetitive prices for title insurance in California. These supracompetitive prices were achieved as a result of defendants' illegal price-fixing activities and market allocation and division.

46.    Members of the Class include hundreds of thousands, if not millions, of consumers.  They are so numerous that their joinder would be impracticable.

47.    Plaintiff also brings this action as a class action under Rule 23(b)(2) of the Federal Rules of Civil Procedure, for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.  The Rule (b)(2) Class includes all members of the (b)(3) Class, and all consumers who are threatened with injury by the anticompetitive conduct detailed herein.

48.    Defendants have acted, continued to act, refused to act and continued to refuse to act on grounds generally applicable to the Rule (b)(2) Class, thereby

CLASS ACTION COMPLAINT

making appropriate final injunctive relief with respect to the Rule (b)(2) Class as a whole.

49.    Members of the Rule (b)(2) Class include hundreds of thousands, if not millions, of consumers.  They are so numerous that their joinder would be impracticable.

50.    Common questions of law and fact exist with respect to all Class members and predominate over any questions solely affecting individual Class members.  Among the questions of law or fact common to the class are the following:

- Whether defendants have engaged in the alleged illegal price-fixing activity and market allocation and division.

- The duration and scope of defendants' alleged illegal price-fixing and market allocation and division activity.

- Whether defendants' alleged illegal price-fixing and market allocation and division has caused higher prices to plaintiffs and other purchasers of title insurance in California.

- Whether the Insurance Commissioner has actively supervised defendants' price fixing and market allocation and division.

51.     Plaintiff does not have any conflict of interest with other Class members. Plaintiff's claims are typical of the claims of the Class and they will fairly and adequately reflect the interests of the Class. Counsel is competent and experienced in federal class action and federal antitrust litigation and has been retained to represent the Class.

52.     This action is superior to any other method for the fair and efficient adjudication of this legal dispute since joinder of all members is not only impracticable, but impossible. The damages suffered by certain members of the Class are small in relation to the expense and burden of individual litigation and therefore it is highly impractical for such Class members to seek redress for damages resulting from defendants' anticompetitive conduct.

53.     There will be no extraordinary difficulty in the management of the Class action.

## VI.    TRADE AND COMMERCE

54.     During all or part of the period in suit, defendants and their co-conspirators were sellers of title insurance in California.

55.     During the period in suit, the defendants sold substantial quantities of title insurance in a continuous and uninterrupted flow in interstate commerce. In 2005, consumers in the United States paid $17 billion for residential title insurance policies.

56.   During the period in suit, Class members from locations outside California purchased commercial or residential property and title insurance within California.

57.   During the period in suit, the defendants were the major sellers of title insurance in the United States and California.  Defendants controlled in excess of 85 percent of the market for title insurance in the United States and California.

58.   The activities of the defendants and their co-conspirators, as described herein, were within the flow of interstate commerce and substantially affected interstate commerce.

## VII.   FACTUAL ALLEGATIONS

### A.   The Nature of Title Insurance

59.   Title insurance is one of most costly items associated with the closing of a real estate transaction.  In California, rates for title insurance are based on a percentage of the total value of the property being insured.  For residential properties, this price ranged in 2005 from about $1,010 (for a $250,000.00) property to $1,490 (for a $500,000 property).  For more expensive homes and commercial properties, these prices are significantly higher.  This amount spent on title insurance has risen dramatically over the past decade.

60.   Title insurance serves an important purpose.  It protects the purchaser of a property from any unidentified defects in the title that would in any way interfere

with the full and complete ownership and use of the property with the ultimate right to resell the property. Title insurance is required by lenders in most residential and commercial real estate transactions.

61.     Title insurance companies operate their business on the premise that consumers are generally uninformed or unaware of all matters concerning title insurance. Consumers are generally not presented, at any time, with an opportunity to make an independent decision regarding any aspect of their propery title. That decision is typically made for them by their lawyer, mortgage broker, lender, or realtor. Consequently, for most purchasers, the cost of title insurance is not challenged. Most consumers do not even become aware of the price they will pay and to which insurer they will pay it until the actual closing of the real estate transaction. By then it's too late, consumers can't attempt to negotiate a better title insurance price or alternate provider for fear of delaying or derailing the entire transaction. There is no shopping around. There is no negotiation of price.

62.     This dynamic basically removes the sale of title insurance from the normal competitive process. Unlike the regular forces of supply and demand that keep most industries and their pricing in check, the title insurance industry is not subject to any real competitive constraints. The purchasers of the insurance, in most instances, are not the ones making the purchasing decisions. And, they are certainly in no position to question the price.

63.    The most effective, but illegal, way for a particular title insurer to get business is to encourage those making the purchasing decisions – the real-estate middlemen – to steer business to that insurer.  The best way to so motivate the middlemen is not through lower prices (that they are not even paying).  Rather, it is through kickbacks in the form of finder's fees, gifts, meals, business services and other financial enticements.  Therefore, it is through higher pricing (which allows for generous inducements and kick-backs), not lower pricing, that provides the best way for title insurers to compete and increase their business.

**B.    Price-Fixing in the Large Markets**

64.    New York is one of several states in which the leading title insurers collectively fix their prices through a rate-setting organization like TIRSA.  There are two principal cost components that go into TIRSA's calculation.  One comprises the risk associated with issuing the title policy.  The other comprises the "agency commissions" paid to title agents.

65.    The risk component covers the risk the title insurer bears for any undiscovered defects in the title.  Unlike property insurance, title insurance carries with it a very limited risk of loss to the insurer.  That is because title insurance protects against unknown *prior* events that cause defects in title.  With a proper search and examination of prior ownership records, any such defects can and almost always are readily identified and excluded from the policy's coverage.

Consequently, the average claim payout on a title insurance policy in the United States amounts to only about 5 percent of the total premium collected. This is very different from property coverage (such as auto and home insurance) – which protects against *future* occurrences over which the insurer has little to no control – where the average claim payout amounts to about 80 percent of the total premium.

66. The "agency commissions" component of the title insurance rate covers payments made to title agents. Defendants have an ownership or management stake in many of the title agencies to which these payments are made. A small portion of these payments is for the search and exam of prior ownership records of the property being purchased to identify any liens, encumbrances, burdens, exclusions, or other defects in the title. The search and exam function does not involve the spreading or underwriting of risk, and title insurers typically outsource this task to title agents.

67. The remainder, and by far the bulk, of the agency commissions are comprised of costs unrelated to the issuance of title insurance. These costs include kickbacks and other financial inducements title insurers provide to title agents and indirectly (through title agents) to the lawyers, brokers, and lenders who, in reality, are the ones deciding which title insurer to use. These payments have nothing to do with the issuance of title insurance and are made by title insurers merely to inflate their revenues and steer business their way.

68. Under TIRSA's collective rate setting regime, roughly 85 percent of the total title insurance premium is based on the so-called "costs" associated with the

CLASS ACTION COMPLAINT

payment of agency commissions.  Only 15 percent is based on costs associated with the risk of loss.

69.     TIRSA publishes its final calculated title rates in the New York Title Insurance Rate Manual.  These rates are tied to the value of the property being insured.  This is so despite the fact that the costs associated with agency commissions are entirely unrelated to the value of the property.  Indeed, agency kickbacks and enticements have little to do with producing a particular title policy and provide no value -- proportional to property value or otherwise – to the consumer.  Even search and exam costs are unrelated to property value.  They instead depend on the age of the property, the complexity of the ownership history, and the accessibility of prior ownership records.

70.     There are other states in which the defendants overtly meet and agree to fix the rates for title insurance as part of a formal collective rate setting process.

C.     **TIRSA's Formation**

71.     Prior to TIRSA, the New York Board of Title Underwriters ("NYBTU") served as the title insurance rate-setting body in New York.  NYBTU, along with the title insurance rate setting bureaus in many other states, was disbanded in the mid-1980s in the wake of a Federal Trade Commission ("FTC") challenge to the collective rate setting activity of many of these associations.  The FTC's challenge culminated in *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621 (1992), where the Supreme

Court held that to avoid *per se* illegal price fixing liability, the rate setting activity of these rating bureaus must be actively supervised by the state.

72.    In *Ticor*, the FTC focused its challenge on agency commissions. The FTC contended that the respective state insurance departments merely rubber-stamped this portion of the collectively fixed rates without any independent review or analysis of their reasonableness or cost justification. The Supreme Court agreed with the FTC that this kind of limited state oversight was not sufficient. Rather, to avoid illegal price-fixing liability, the state insurance department has to "exercise[]sufficient independent judgment and control so that the details of the rates or prices have been established as a product of deliberate state intervention, not simply by agreement among private parties." *Ticor*, 504 U.S. at 634-35.

73.    Following the Supreme Court's instruction in *Ticor*, the Third Circuit on remand in *Ticor Title Ins. Co. v. FTC*, 998 F.2d 1129 (3d Cir. 1992), upheld the FTC's finding that the collective rate-setting of certain state rating bureaus was improper because it was not actively supervised by the state. According to the circuit court, "[t]he Supreme Court plainly instructed us that a state's rubber stamp is not enough. Active supervision requires the state regulatory authorities' independent review and approval." *Id.* at 1139.

74.    Defendants formulated TIRSA's first rate manual and procedure soon after the Supreme Court's *Ticor* decision. Through TIRSA, defendants have set up a rate-setting scheme to get around the rigors of state oversight required by *Ticor*.

They have done so by calculating a single rate that comprises both risk and agency commission costs and by outsourcing to title agents the agency commission costs. In this way, defendants avoid providing the Insurance Department with any detailed breakout or backup for the bulk of the costs that make up their collectively fixed rates.

75.    TIRSA merely submits an aggregated figure that is supposed to represent the total agency commission costs. Embedded within this figure is the vast quantity of dollars that are funneled to and through the title agencies as kickbacks, financial inducements and other costs unrelated to the issuance of title insurance. Defendants' design in all of this has been to effective "hide" the cost basis for their artificially high and collectively fixed title insurance premiums from the regulatory scrutiny that *Ticor* demands.

**D.    Lack of Regulatory Supervision and Authority in New York and Other States Including California**

76.    There is no provision under the New York Insurance Law for TIRSA to include in its collectively fixed rates kickbacks and other agency commission payments unrelated to the issuance of title insurance. Indeed, the New York Insurance Department has openly acknowledged that it lacks the authority to review any agency commission payments. It has likewise recognized that defendants' outsourcing of agency commission costs has prevented it from performing a

meaningful review of TIRSA's calculated rates. This was made clear at a November 2006 public hearing the New York Insurance Department held – the first in 15 years -- where it questioned TIRSA and its members on TIRSA's failure to provide the Insurance Department with any backup or detail for agency commissions.

77.     At the hearing, the Insurance Department conceded that it could not properly evaluate TIRSA's calculated rates, and that it could only do so if it obtained the detailed cost information on agency commissions that TIRSA does not provide.

78.     The Insurance Department's recognition that it is not properly supervising TIRSA's rate-setting activity is consistent with the April 2007 findings of the U.S. Government Accountability Office ("GAO") that the title insurance industry is in need of greater state regulation. The GAO studied the industry conditions of several states, including New York, and concluded that "state regulators have not collected the type of data, *primarily on title agents' costs and operations,* needed to analyze premium prices and underlying costs." (Emphasis added.)

79.     Unchecked by regulatory review and insulated from competition, defendants have thus been able to collectively fix title insurance rates at supra competitive levels and earn profits that vastly exceed those contemplated by the Insurance Department or that would have resulted in a free and open competitive market.

CLASS ACTION COMPLAINT

80.   At the time of TIRSA's formation, the Insurance Department established 5 percent (of the total premium) as the level of profit to which title insurers are entitled.  The Insurance Department is supposed to carefully analyze TIRSA's rate calculations, and, in particular, its revenue and cost information, to ensure that this 5 percent profit level is maintained and based on a reasonable premium.  However, without the authority or ability to scrutinize agency commission costs, the Insurance Department has been unable to perform this function.  As a result, defendants (through TIRSA) have been able to set artificially high title premiums and secure title profits far in excess of the 5 percent threshold.

81.   Through an independent investigation conducted over the past several years, the New York State Attorney General found that for every dollar of insurance premium defendants collected, of the roughly 15 cents that supposedly accounts for the risk of loss, only 3 cents is paid out in claims.  And, of the roughly 85 cents that supposedly covers agency commissions, only between 8 and 11 cents goes to costs actually incurred by title agents in producing the title policy.  These numbers show that title insurers' collectively fixed rates have resulted in profits that untethered to and vastly exceed the costs of producing such policies.

82.   The New York Attorney General's investigation further revealed that what was largely driving these numbers were the kickbacks and other financial inducements defendants were funneling to and through title agents to secure more business.  As reported at the New York Insurance Department's 2006 hearing, one

title agency's financial statements revealed that it spent more than $1 million of these so-called "agency commissions" on items identified as "Christmas", "automobile expenses", "political contributions", "promotional expenses", and "travel and entertainment". These expenses are not even remotely related to the issuance of title insurance.

83.    A report to the California Inurance Comissioner prepared by Barry Birnbaum, Consulting Economist, in December 2005, found strikingly similar abuses, "We found numerous examples in California of illegal rebates and kickbacks where the title insurer or the underwritten title company provides money, free services or other things of value to a real estate agent, a lender or homebuilder in exchange for business referrals."(*An Analysis of Competition in the California Title Insurance and Escrow Industry,* December 2005, p. 3)

84.    All of this "excess money" paid to title agents not only works to steer business to defendants. It also serves to boost defendants' own profits through the inflated revenues they obtain to cover these agency payments and through their ownership or management stake in many of these agencies.

85.    Defendants are competitors in the sale of title insurance to consumers throughout the United States. These title insurers have agreed and engaged in concerted efforts to (i) collectively set and charge uniform and supracompetitive rates for title insurance, (ii) include in their calculated rates agency commission costs, (iii) embed within these costs payoffs, kickbacks, and other charges that are

unrelated to the issuance of title insurance, and (iv) hide these supposed "costs" from regulatory scrutiny by funneling them to and through title agents over which the government agencies have no ability or authority to regulate.

86.    The GAO in its 2007 report entitled "Actions Needed to Improve Oversight of the Title Insurance Industry and Better Protect Consumers" found several indicia of a lack of competition and questions about the reasonableness of prices including:

- Consumers find it difficult to shop for title insurance, therefore, they put little pressure on insurers and agents to compete based on price;

- Title agents do not market to consumers, who pay for title insurance, but to those in the position to refer consumers to particular title agents, thus creating potential conflicts of interest;

- A number of recent investigations by HUD and state regulatory officials have identified instances of alleged illegal activities with the title industry that appear to reduce price competition and could indicate excessive prices;

- As property values or loan amounts increase, prices paid for title insurance by consumers appear to increase faster than insurers' and agents' costs; and

- In states where agents' search and examination services are not included in the premium paid by consumers, it is not clear that additional amounts paid to title agents are fully supported by underlying costs.

87.    The GAO visited several states, including California, and found a lack of regulatory oversight:

> In the states we visited, we found that regulators did not assess title agents' costs to determine whether they were in line with premium rates; had made only limited efforts to oversee title agents (including ABAs involving insurers and agents); and, until recently, had taken few actions against alleged violations of antikickback laws.  In part, this situation has resulted from a lack of resources and limited coordination among different regulators within states.  On the federal level, authority for alleged violations of section 8 of RESPA, including those involving increasingly complex ABAs, is limited to seeking injunctive relief.  Some state regulators expressed frustration with HUD's level of responsiveness to their requests for help with enforcement, and some industry officials said that RESPA rules regarding ABAs and referral fees need to be clarified.  Industry and government stakeholders have proposed several regulatory changes, including RESPA reform, strengthened regulation of agents, a competitor right of action with no monetary

CLASS ACTION COMPLAINT

penalty, and alternative title insurance models.  [*Id.* at 41, footnotes omitted.]

**E.    Competition Based on Kickbacks and Inducements But Not Rates**

88.    Having agreed to fix or stabilize prices in New York and other states where they overtly meet to promulgate rates, these same defendants then set out to do the same in other states.

89.    In other words, as a direct result of these meetings where rates were agreed to, these same defendants agreed, either expressly or tacitly, to not compete on rates in other states as well.  To compete on rates in other states could and would imperil their ability to maintain the agreed rate in states like New York.

90.    As is the case in New York, a lack of regulatory authority over rates created an environment in which a conspiracy can and did succeed.  No agency was examining why all the rates were virtually identical, and no agency was examining whether the costs associated with these premiums were reasonable.  This is an environment which is conducive to price fixing.

91.    In California, there is a lack of regulatory authority and oversight over title insurance companies.  The rates in California are not set as part of a deliberate state intervention and the state does not and cannot meaningfully renew or approve these rates.  The rates at issue in this case went into effect without review.

92.    In fact, in February of 2007, the Insurance Comissioner of California, Steve Poizner issued a statement concluding "that reasonable price competition does

not exist for title and escrow services." (*Inurance Commisssioner Steve Poizner Issues Statement Following Decision by OAL on New Regulations*, California Department of Insurance, February 22, 2007)

## F. Other Indicators of a Lack of Competition and Conditions Conducive to Collusive Rate Setting

93.    In addition to the uniformity of rates, other facts suggest that it is more plausible than not that rates have been set based on an agreement to fix prices.

94.    In theory, the chain of title should be documented back to its historic grant of ownership centuries in the past.  Fear about a possible title defect in the distant past is widely used as a justification by title agencies when convincing property buyers to purchase an owner policy in addition to the lender policy, which is mandatory to secure a mortgage.  The title agency, however, saves much time and money when the search is limited to one or two transactions.  They rely on the insurance policy to cover the remote chance of missing an earlier but still-valid claim.  If such a claim is asserted and survives the scrutiny of the title insurance company's legal department, the expected cost of compensation is likely to be less than the sum of added overhead costs of routinely tracing back every chain of title to the earliest registered owner in the distant past.

95.    Title insurance industry officials tend to justify the large proportion of the premium retained by the title abstract and settlement agency (from 60 to more

CLASS ACTION COMPLAINT

than 90 percent) by the alleged high cost of title searching back into the distant past. In fact, a high proportion of noncommercial properties are searched only through the most recent transaction. No information is available as to what proportion of claims originate in the distant past. The industry has never published pertinent statistics. It would have a marketing incentive to publish these statistics if the risk were significant; that it has not published these statistics indicates that the risk probably is only slightly greater than zero.

96.    Many U.S. homes are being resold three or four times in twenty-five years. At each of these occasions, an abstract of title will be prepared on the basis of a more or less thorough review of the available title records, inheritance records, family records and records of past or current liens against a property. It is reasonable, therefore, to suspect that the risk of a title defect will decrease every time a property is sold.

97.    Title searches have become less labor intensive, especially in large urban counties and cities. More and more of the information is available online. The statistical likelihood that a title default would be overlooked is a closely held industry secret, but it appears to be so small that many transactions are now insured on the basis of a search of the last owner's title history or a search into transactions that occurred during the last twenty-five to thirty-five years. The evidence is strong that the title insurance industry has achieved a remarkably high level of loss minimization. Indeed, the national everage recovery for a claim on a title insurance

policy is appoximately 5% of the total premium.  On the other hand, the national

average for property insurance is approximately 80% of the total premium collected.

98.    Thus the costs of production have decreased as has the risk of loss yet

none of these factors has resulted in price competition at the consumer level.

99.    There is a remarkable absence of rate changes by title insurers over the

past five years, despite declining costs of production, increased number of

transactions and increased revenue per transaction.  During a period when costs per

unit of production declined significantly, underwritten title companies and title

insurers maintained excessive rates.  The prices charged by title insurers and

underwritten title companies were not and are not responsive to the changing costs of

production or increasing revenue per transaction at a given set of rates.  Again, this is

indicia of an agreement not to compete based on price.

100.   As noted, the title companies engage in illegal rebates and kickbacks

where the title insurer or the underwritten title company provides money, free

services or other things of value to a real estate agent, a lender or homebuilder in

exchange for business referrals.  These illegal rebates and kickbacks – a consequence

of reverse competition – show that title insurance rates are supra competitive and that

some portion of the overcharge is passed from the underwritten title company or title

insurer to the referrer of business.

101.   A lack of competition and the ability to control prices is enhanced by

the fact that there were few title insurer entrants over the period from 1995 through

2005 and the number of title insurer groups declined as title insurers acquired other title insurers. There were few underwritten title company entrants over the 2000 to 2005 period and new entrants were controlled business arrangements whose addition to the market did not result in greater price competition.

102.   Access to title plants can be a barrier to entry, but a large barrier to entry exists due to the established relationships between the entities that can steer the consumer's title and escrow business and the entities who sell title insurance and escrow services.

103.   The title insurance market is highly concentrated – a few title insurers account for the vast majority of title insurance sales – at both the statewide level and at the county level in California. For example, three title insurer groups account for 77.4% of the market at a statewide level. At the county level, each individual market was highly concentrated. The GAO found that First American and Fidelity had a market share of 66 percent. Such a concentration enhances the ability of companies to fix prices

104.   The agreement not to compete based on price is also evidenced by the fact that no company has marketed its services to consumers, the ultimate purchasers of the product. This is in marked contrast to real insurance, for example, car insurance, where the companies compete vigorously with well recognized slogans such as State Farm's "Like a Good Neighbor," or Allstate's "good hands," or the cute (to some) GEICO gecko promising low prices.

105.   As a result of this lack of competition, California title inturance and escrow services markets have enjoyed excessive profits, "In a competitive market, sellers earn a reasonable profit.  In the California title insurance and escrown services markets, bot the title insurers and the underwritten title companies realized excessive profits over an extended period of time.  In 2003 and 2004, underwritten title companies in California earned after-tax profits of 49.0% and 32.3% respectively – excessive by any reasonable measure." (*An Analysis of Competition in the California Title Insurance and Escrow Industry,* December 2005, p. 2)

## VIII.   CLAIMS FOR RELIEF

### COUNT I

### Violation of the Sherman Act

106.   Plaintiff incorporates by reference the preceding allegations.

107.   Beginning at least as early as May 2004, and continuing thereafter to the present, the exact dates being unknown to plaintiff, defendants and their co-conspirators engaged in a combination and conspiracy in unreasonable restraint of the aforesaid interstate trade and commerce in violation of Section 1 of the Sherman Act.

108.   The aforesaid combination and conspiracy has consisted of a continuing agreement, understanding and concert of action among the defendants and their co-conspirators, the substantial terms of which have been:

CLASS ACTION COMPLAINT

(a)     to fix, raise, maintain and stabilize the price of title insurance throughout California;

(b)     to fix, raise, maintain and stabilize the terms and conditions of sale of title insurance in Californi; and

(c)     to allocate and divide the market for title insurance in California.

109.   In the absence of proper regulatory authority and oversight, defendants' conduct constitutes a horizontal agreement to fix the form, structure, and prices of title insurance and to allocate and divide the title insurance market in California and is a *per se* violation of Section I of the Sherman Act.

110.   Defendants' price-fixing, market allocation and division activity has been continuous throughout the relevant damages period and has been renewed and reinforced annually through submissions to the OIC of supposed cost and revenue information and its periodic submissions of rate changes.

111.   Through their collective price-fixing, market allocation and division and manipulation of the regulatory process, defendants have harmed competition by charging consumers supra competitive prices for title insurance in California, evidenced in part by the fact that the prices are uniformly higher than compared with the cost of providing the insurance.

112.   The aforesaid combination and conspiracy has had the following effects among others:

(a)    price competition in the sale of title insurance has been suppressed, restrained and eliminated;

(b)    prices for title insurance have been raised, fixed, maintained and stabilized at artificially high and non-competitive levels; and

(c)    purchasers of title insurance have been deprived of the benefit of free and open competition.

113.   During the period of the antitrust violations by defendants and their co-conspirators, plaintiff and each member of the Class she represents, has purchased title insurance and, by reason of the antitrust violations herein alleged, paid more for such that it would have paid in the absence of said antitrust violations.  As a result, plaintiff and each member of the Class she represents, has been injured and damaged in an amount presently undetermined.

## COUNT II

### Violation of Cal. Bus. and Prof. Code §§ 16720, *et seq.*

114.   Plaintiff incorporates by reference the preceding allegations.

115.   Defendants conduct as set forth above is in violation of the Cartwright Act of California (Cal. Bus. & Prof. Code §§ 16720, *et seq.*).

116.   As a direct result of defendants' unlawful acts plaintiffs have paid artificially inflated prices for title insurance and have suffered injury to their business and property.

# COUNT III

## (California's Business & Professions Code §§ 17200, *et seq.*)

117.   The preceding paragraphs of this Complaint are realleged and incorporated by reference.   Plaintiff asserts this claim for violations of California's UCL, Bus. & Prof. Code §§ 17200, *et seq.*, on behalf of herself and the members of the Class.

118.   Defendants' statements and representations constitute unfair, unlawful and deceptive trade practices in violation of the UCL.

119.   All of the wrongful conduct alleged herein occurs and continues to occur in the conduct of defendants' business.  Defendants' wrongful conduct is part of a pattern or generalized course of conduct that is repeated in the State of California on hundreds, if not thousands, of occasions daily.

120.   Plaintiff has suffered injury in fact and has lost money or property as a result of defendants' unfair, unlawful and/or deceptive practices by paying a higher price for title insurance then she would or should have absent the conduct complained of.

121.   Plaintiff requests that this Court enter such orders or judgment as may be necessary to enjoin the defendants from continuing its unfair, unlawful, and/or deceptive practices, to restore to any person in interest any money which may have been acquired by means of such unfair competition and to disgorge any profits

realized by defendants as a result of its unfair, unlawful and/or deceptive practices, as provided in Cal. Bus. & Prof. Code § 17203 and Cal. Civ. Code § 3345, and for such other relief as set forth in the Prayer for Relief.

### COUNT IV

### UNJUST ENRICHMENT

122.   Plaintiff incorporates by reference the preceding allegations.

123.   This Cause of Action is pled in the alternative to all claims and/or causes of action at law.

124.   Defendant has received a benefit from plaintiff and the Class members in the form of the prices plaintiff and the Class members paid for defendants' title insurance.

125.   Defendants are aware of their receipt of the above-described benefit.

126.   Defendants received the above-described benefit to the detriment of plaintiff and each of the other members of the Class.

127.   Defendants continue to retain the above-described benefit to the detriment of plaintiff and the Class members.

128.   As a result of defendants' unjust enrichment, plaintiff and the Class members have sustained damages in an amount to be determined at trial and seek full disgorgement and restitution of defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful or wrongful conduct alleged above.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# PRAYER FOR RELIEF

WHEREFORE, plaintiff demands:

A.    That the alleged combination and conspiracy among the defendants and their co-conspirators be adjudged and decreed to be an unreasonable restraint of trade in violation of Section 1 of the Sherman Act;

B.    That the Court declare that the premiums charged are excessive under state law and order damages;

C.    That judgment be entered against defendants, jointly and severally, and in favor of plaintiff, and each member of the Class it represents, for threefold the damages determined to have been sustained by plaintiff, and each member of the Class it represents, together with the cost of suit, including a reasonable attorneys' fee;

D.    Each of the defendants, successors, assignees, subsidiaries and transferees, and their respective officers, directors, agents and employees, and all other persons acting or claiming to act on behalf thereof or in concert therewith, be perpetually enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the aforesaid combination, conspiracy, agreement, understanding or concert of action, adopting or following any practice, plan, program, or design having a similar purpose or effect in restraining competition; and

CLASS ACTION COMPLAINT

E.    Such other and further relief as may appear necessary and appropriate.

## JURY TRIAL DEMANDED

Pursuant to Rule 38, F.R.C.P., plaintiff demands a trial by jury of the claims alleged herein.

DATED: June 3 , 2008

Brian Barry
LAW OFFICES OF BRIAN BARRY
1801 Avenue of the Stars, Suite 307
Los Angeles, California 90067
Telephone:  (310) 788-0831
Facsimile:   (310) 788-0841

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Alicemarie H. Stotler and the assigned discovery Magistrate Judge is Arthur Nakazato.

The case number on all documents filed with the Court should read as follows:

## SACV08- 620 AHS (ANx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [ ] **Western Division** | [X] **Southern Division** | [ ] **Eastern Division** |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Mark Moynahan, on behalf of himself and all others similarly situated,<br><br>PLAINTIFF(S)<br><br>v.<br><br>FIDELITY NATIONAL FINANCIAL, INC., et. al.<br>(see attachment)<br><br><br>DEFENDANT(S). | CASE NUMBER<br><br>SACV08-0620 AHS (ANx)<br><br><br><br>**SUMMONS** |

TO:     DEFENDANT(S):

A lawsuit has been filed against you.

Within __20__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☒ complaint _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.   The answer or motion must be served on the plaintiff's attorney, _Brian Barry_____, whose address is _1801 Avneue of the Stars, Suite 307_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: ____JUN - 4 2008____

By: _Natalie Konyeric_

Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

1  Brian Barry (135631: bribarry1@yahoo.com)
   LAW OFFICES OF BRIAN BARRY
2  1801 Avenue of the Stars, Suite 307
   Los Angeles, California 90067
3  Telephone:  (310) 788-0831
   Facsimile:  (310) 788-0841
4
5  *Attorneys for Plaintiff*

6              **UNITED STATES DISTRICT COURT**

7              **CENTRAL DISTRICT OF CALIFORNIA**

8  | Mark Moynahan, on behalf of himself and all others similarly situated, | ) | Case No. |
   |---|---|---|
9  |  | ) |  |
10 | Plaintiff, | ) |  |
11 | v. | ) | **CLASS ACTION COMPLAINT** |
12 | FIDELITY NATIONAL FINANCIAL, INC., FIDELITY NATIONAL TITLE INSURANCE COMPANY, TICOR TITLE INSURANCE COMPANY, TICOR TITLE INSURANCE COMPANY OF FLORIDA, CHICAGO TITLE INSURANCE COMPANY, NATIONAL TITLE INSURANCE OF NEW YORK, INC., SECURITY UNION TITLE INSURANCE COMPANY, THE FIRST AMERICAN CORPORATION, FIRST AMERICAN TITLE INSURANCE COMPANY, UNITED GENERAL TITLE INSURANCE COMPANY, LANDAMERICA FINANCIAL GROUP, INC., COMMONWEALTH LAND TITLE INSURANCE COMPANY, LAWYERS TITLE INSURANCE CORPORATION, TRANSNATION TITLE INSURANCE COMPANY, STEWART TITLE GUARANTY COMPANY and STEWART TITLE INSURANCE COMPANY | ) | **JURY TRIAL DEMANDED** |
   |  | ) |  |
   | Defendants. | ) |  |

COPY

CLASS ACTION COMPLAINT

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

Mark Moynahan, on behalf of himself and all others similarly situated,

PLAINTIFF(S)

v.

FIDELITY NATIONAL FINANCIAL, INC., et. al.
(see attachment)

DEFENDANT(S).

**CASE NUMBER**

SACV08-0620 AHS (ANx)

**SUMMONS**

TO:    DEFENDANT(S):

A lawsuit has been filed against you.

Within __20__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☒ complaint _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, Brian Barry _____, whose address is 1801 Avneue of the Stars, Suite 307 _____.  If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: _____JUN - 4 2008_____

By: ___NATALIE LONGORIA___
Deputy Clerk

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

1198

CV-01A (12/07)                          SUMMONS

1    Brian Barry (135631: bribarry1@yahoo.com)
     LAW OFFICES OF BRIAN BARRY
2    1801 Avenue of the Stars, Suite 307
     Los Angeles, California 90067
3    Telephone:  (310) 788-0831
     Facsimile:  (310) 788-0841
4

5    *Attorneys for Plaintiff*

6                    UNITED STATES DISTRICT COURT

7                   CENTRAL DISTRICT OF CALIFORNIA

8    Mark Moynahan, on behalf of himself and all    )
9    others similarly situated,                      )    Case No.
                                                     )
10                        Plaintiff,                 )
                                                     )
11        v.                                          )    **CLASS ACTION
                                                     )    COMPLAINT**
12   FIDELITY NATIONAL FINANCIAL, INC.,             )
     FIDELITY NATIONAL TITLE                         )    **JURY TRIAL DEMANDED**
13   INSURANCE COMPANY, TICOR TITLE                 )
     INSURANCE COMPANY, TICOR TITLE                 )
14   INSURANCE COMPANY OF FLORIDA,                  )
     CHICAGO TITLE INSURANCE                         )
15   COMPANY, NATIONAL TITLE                         )
     INSURANCE OF NEW YORK, INC.,                    )
16   SECURITY UNION TITLE INSURANCE                 )
     COMPANY, THE FIRST AMERICAN                     )
17   CORPORATION, FIRST AMERICAN                     )
     TITLE INSURANCE COMPANY, UNITED                )
18   GENERAL TITLE INSURANCE                         )
     COMPANY, LANDAMERICA FINANCIAL                 )
19   GROUP, INC., COMMONWEALTH LAND                 )
     TITLE INSURANCE COMPANY,                        )
20   LAWYERS TITLE INSURANCE                         )
     CORPORATION, TRANSNATION TITLE                 )
21   INSURANCE COMPANY, STEWART                      )
     TITLE GUARANTY COMPANY and                      )
22   STEWART TITLE INSURANCE                         )
     COMPANY                                         )
23                                                   )
                                                     )
24                        Defendants.                )
                                                     )
25

26

27

28

CLASS ACTION COMPLAINT

COPY

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
Mark Moynaham

**DEFENDANTS**
Fidelity National Financial, Inc., et. al.

**(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
Law Offices of Brian Barry
1801 Avenue of the Stars, Suite 307, Los Angeles, CA 90067
Phone: (310) 788-0831

**Attorneys** (If Known)

---

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff    ☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant    ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

---

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding    ☐ 2 Removed from State Court    ☐ 3 Remanded from Appellate Court    ☐ 4 Reinstated or Reopened    ☐ 5 Transferred from another district (specify):    ☐ 6 Multi-District Litigation    ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☒ Yes ☐ No      ☐ MONEY DEMANDED IN COMPLAINT: $ _____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Sherman Act requetst for antitrust injunctive releif

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☒ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | **FORFEITURE / PENALTY** | **PROPERTY RIGHTS** |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury- Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury- Product Liability | ☐ 443 Housing/Acco- mmodations | ☐ 630 Liquor Laws | **SOCIAL SECURITY** |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 640 R.R. & Truck | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities - Employment | ☐ 650 Airline Regs | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | **REAL PROPERTY** | | | ☐ 660 Occupational Safety /Health | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | **IMMIGRATION** | ☐ 446 American with Disabilities - Other | ☐ 690 Other | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 462 Naturalization Application | ☐ 440 Other Civil Rights | | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | ☐ 463 Habeas Corpus- Alien Detainee | | | **FEDERAL TAX SUITS** |
| ☐ 900 Appeal of Fee Determi- nation Under Equal Access to Justice | ☐ 240 Torts to Land | ☐ 465 Other Immigration Actions | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

---

**FOR OFFICE USE ONLY:** Case Number: _____

**SACV08-0620**

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

CV-71 (05/08)      CIVIL COVER SHEET      Page 1 of 2

